IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

TIMOTHY W. DUPUIS                                                    PETITIONER

VS.                                           CIVIL ACTION NO. 3:08cv558-DPJ-FKB

JIM HOOD and the STATE OF
MISSISSIPPI                                                        RESPONDENTS

MEMORANDUM AND OPINION

This action is brought by a state prisoner pursuant to 28 U.S.C. § 2254.  The

United States Magistrate Judge entered a report and recommendation in which he

concluded that the claims were procedurally barred and recommended that the petition be

dismissed.  Presently before the Court is Petitioner's objection to the report and

recommendation.  For the reasons stated herein, the Court concludes that habeas relief

should be denied.

I.      **Factual and Procedural History**

Jenny Smith[1] lived with her parents, Bob and Susan Smith, and her younger sister

in Brookhaven, Mississippi.  A few blocks away were Bob's sister, Nancy Dupuis, and her

husband, Tim Dupuis, along with their two sons.  The two families were close and spent a

great deal of time together.  On the evening of April 15, 2001, Jenny, who was then ten

years old, and her younger sister, Jessica, spent the night at the Dupuis home; Jenny

slept on the living-room sofa.  Sleeping elsewhere in the room were Jessica and the

Dupuises' youngest son.  Around 5:30 a.m. the next morning, Bob Smith received a

---

[1]The victim and her parents' names have been changed to protect the minor.

phone call from his daughter.  Jenny was crying and asked to speak to her mother.  Once Susan Smith was on the phone, Jenny told her mother that "Uncle Tim" had "messed with" her.  The mother rushed over to the Dupuis home, where she found Jenny crying and wrapped in a blanket.  Susan Smith woke her sister-in-law Nancy and called the police and her husband Bob Smith, asking them to meet her at the hospital.  Susan, Jenny, and Nancy then went to the local hospital, where Jenny was interviewed and examined by a nurse and a doctor.  Jenny told them that she woke up that morning to find her uncle on the couch with her, rubbing her back and legs and telling her she was beautiful.  He then placed his hand in her underwear and penetrated her vagina with his fingers.  Jenny said she pretended to be asleep during the assault.  A physical examination revealed no injuries or trauma.  Jenny was also interviewed at the hospital by Amanda Russell, a Department of Human Services (DHS) social worker.  Pursuant to DHS protocol for suspected child abuse cases, a counselor at the Children's Advocacy Center (CAC) in McComb, Bente Hess, interviewed Jenny the next day.  Following the interview, Ms. Hess prepared a report in which she characterized Jenny's allegations as substantiated.

Dupuis was indicted in the Circuit Court of Lincoln County, Mississippi, for the crime of sexual battery. His first trial resulted in a hung jury.  At his second trial, the primary witnesses for the prosecution were Jenny, the nurse and physician who examined her, Amanda Russell, Bente Hess, and Susan Smith.  Dupuis testified in his own defense and denied that he had molested Jenny in any way.  The jury at the second trial convicted Dupuis of the lesser crime of touching a child for lustful purposes, and the court

sentenced him to a term of fifteen years.

Dupuis appealed his conviction and sentence, raising the following assignments of error:

The verdict was against the overwhelming weight of the evidence.

The state's attempt to elicit testimony regarding  prior bad acts violated the court's ruling on the motion in limine, and was contrary to the rules of evidence, and the trial court's failure to stop the conduct was error.

The verdict was not supported by any corroborating physical evidence.

The Mississippi Court of Appeals affirmed the conviction and sentence.  Dupuis then filed a petition for rehearing, arguing that the court of appeals lacked jurisdiction over the appeal and that the trial court had lacked jurisdiction to convict Dupuis of the crime of touching a child for lustful purposes.  The court of appeals denied the motion for rehearing and entered a new opinion affirming the conviction and sentence.  Dupuis did not seek a writ of certiorari to the Mississippi Supreme Court.

Dupuis thereafter filed in the Mississippi Supreme Court an application for leave to proceed in the trial court with a motion for post-conviction relief (PCR), asserting that he had received ineffective assistance of counsel because his trial attorney had a conflict of interest.  The nature of the alleged conflict was his attorney's representation of the City of Brookhaven at the time of Dupuis's trial—a trial in which three Brookhaven police officers testified for the state.  The supreme court entered an order granting Dupuis leave to proceed in the trial court and holding that he was entitled to an evidentiary hearing.  That hearing was held in the Circuit Court of Lincoln County, Mississippi; Dupuis was represented by counsel.

3

After hearing testimony from several witnesses, including Dupuis, his trial counsel, the prosecutor, and the judge who had presided over his trial, the hearing judge denied the PCR application from the bench.  The judge found that a conflict of interest had existed, but that Dupuis was not prejudiced by it and had waived the conflict.  Dupuis appealed the denial of his PCR application, and the Mississippi Court of Appeals affirmed.  Again, Dupuis failed to seek a writ of certiorari to the state supreme court.

Dupuis then filed the present petition for federal habeas relief, in which he raises the following grounds:

I.      His trial attorney rendered ineffective assistance of counsel by the following acts or omissions:

    A.      He misrepresented the nature of the conflict of interest.

    B.      He failed to properly cross-examine the state's witnesses.

    C.      He failed to object to admission into evidence of the police report.

    D.      He improperly bolstered the testimony of the police officers testifying for the prosecution.

    E.      He failed to preserve errors for appeal.

    F.      He failed to object to the state's closing argument.

    G.      He failed to represent Petitioner effectively at the sentencing hearing.

II.     He received ineffective assistance because of his attorney's conflict of interest.[2]

---

[2]In his petition, Dupuis includes two grounds directed toward the trial court's denial of his PCR application.  In ground three, he states that there was no evidentiary basis for the trial court's finding that he had waived the conflict of interest. In ground four Dupuis argues that the trial court improperly applied the law in denying post-conviction relief.  These allegations do not raise additional grounds for habeas relief.  Rather, they are more accurately characterized as arguments in support of the

4

The petition was referred to the United States Magistrate Judge, who, after reviewing the petition and response, entered a report and recommendation.  The magistrate judge concluded that Dupuis had not properly exhausted his claims.  The Magistrate found that because Dupuis never sought discretionary review in his post-conviction proceeding, he failed to meet the statute's requirement of presenting his claims to the state's highest court in a procedurally proper manner. *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).   Furthermore, because Dupuis no longer had any available procedure for properly exhausting his claims in state court, the magistrate judge concluded that his claims were procedurally defaulted and barred from review by this Court.  *See Sones v. Hargett,* 61 F.3d 410, (5th Cir. 1995); *see also  O'Sullivan,* 526 U.S. at 848; *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).  The magistrate judge recommended that the petition be dismissed.

Dupuis filed an objection to the report and recommendation, in which he implored this Court to consider the merits of his petition, notwithstanding the procedural bar, claiming cause for the default of his claims and prejudice as a result of the constitutional violations. *See Murray v. Carrier*, 477 U.S. 478 (1986).[3]

---

other grounds of the petition.

[3]The cause upon which Dupuis relies concerns his failure to seek discretionary review in his PCR proceeding. Thus, his cause-and-prejudice argument, if accepted by the Court, would not apply to his claims that his attorney rendered ineffective assistance in failing to object to the state's closing argument, nor his claims regarding his attorney's performance at the sentencing hearing and on appeal, as these have never been presented in any state court.  These claims remain barred.

II.     Analysis

Federal habeas review is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  This case implicates the cause-and-prejudice test.

A.     Cause

Dupuis contends that his procedural default should be overlooked for cause.  To prove "cause" Dupuis is burdened with "show[ing] that some objective factor external to the defense prevented him from raising on direct appeal the claim he now advances." *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir.1996) (citations omitted).

Dupuis attempts to meet this burden in two general ways.  As an initial point, he contends that after the Mississippi Court of Appeals denied a motion for rehearing on the dismissal of his PCR motion, he no longer had the benefit of legal counsel and was taking psychotropic medication.  He states, "being in a diminished mental state and not having any prior legal or procedural knowledge of the complex legal system, I was reluctantly, and with no other choice forced to rely solely own [sic] the inmate legal assistance program at EMCF."  Objection at 4.

Dupuis's passing reference to psychotropic medication does not provide grounds to overstep the procedural bar.  While the United States Supreme Court has yet to decide the issue, other circuits have suggested that a mental condition will not excuse a procedural default because it does not qualify as an external impediment.  *See*, *e.g.*,

*Johnson v. Wilson*, 187 F. App'x 455, 458 (6th Cir. 2006) ("While this Circuit has never decided whether a borderline mental impairment can establish cause, the Third, Seventh, Eighth, and Ninth Circuits have all squarely addressed the issue of mental impairment. Each of these Circuits has held that a borderline mental impairment is not a factor external to a defense and, therefore, is not cause for excusing procedural default."). Dupuis's unexplained reference to medication does not established this basis for cause.

For the same reason, the professed lack of legal knowledge is not sufficient. *See United States v. Flores*, 981 F.2d 231, 236 (5th Cir.1993) (holding that inmate's *pro se* status, illiteracy, deafness, or lack of legal training are not factors external to the inmate excusing failure to exhaust).

Dupuis raises a more plausible argument when he states that the ILAP staff misled him into believing that there was no need to appeal to the Mississippi Supreme Court before filing a federal habeas petition. According to Dupuis, the ILAP staff reviewed his case file and then advised him to file a writ of habeas corpus in federal court. Objection at 4. He explains that he also received a federal writ of habeas corpus form packet, which included the following statement: "To proceed in federal court, you must 'ORDINARILY' first exhaust (use up) your available state-court remedies." *Id.* He goes on to complain that the packet failed to alert him that he must file a writ of certiorari in state court and insists that "[h]ad I known, or had I been instructed to file a writ of certiorari prior to filing a writ of habeas corpus by the inmate legal assistance staff, I would have without question, certainly done so, to the best of my ability." *Id.* at 5.

It is debatable whether bad advice from ILAP would constitute the type of external

7

impediment required to prove cause.  That said, some circuits hold that "cause" can exist

when a petitioner "demonstrate[s] that the alleged shortcomings in the library or legal

assistance program hindered his efforts to pursue a legal claim."  *Bourdon v. Loughren*,

386 F.3d 88, 93 (2d Cir. 2004).

Assuming Dupuis's allegations—*if* true—would provide "cause," the scant

evidentiary record is insufficient to determine what advice, if any, Dupuis requested or

received from ILAP.  But because his claim clearly fails to demonstrate prejudice, the

Court will not rule on this aspect of his "cause" argument.

B.    Prejudice

To meet the prejudice prong of the cause-and-prejudice standard, a habeas

petitioner must establish that state-trial constitutional errors worked to his "*actual* and

substantial disadvantage."  *Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008)

(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

"[M]erely establishing that the errors created a possibility of prejudice unequivocally is not

enough."  *Id.* 534 F.3d at 464 (citation omitted).  Whether Dupuis meets this test turns on

the strength of his Sixth Amendment claims.  Thus, the analysis of the prejudice prong for

the cause-and-prejudice test essentially dovetails into an analysis of the merits of those

claims.  *See, e.g., Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) (stating that with

ineffective-assistance claim, a petitioner attempting to overcome a procedural bar by

showing cause and prejudice must establish that "but for the error, he might not have

been convicted" (quoting *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996)).  For

this reason, the Court has considered the merits of Dupuis's Sixth Amendment claims.

8

Dupuis was represented at trial and on appeal by Joseph Fernald.  At the time, Fernald was also employed as the Brookhaven City Attorney.  Dupuis alleges that Fernald had a conflict of interest because three Brookhaven police officers testified for the prosecution at trial, and he further alleges that he never made a knowing and intelligent waiver of that conflict.  The state rejected both arguments.

    1.      Whether Dupuis Waived Conflict

In his application for post-conviction relief, as in his habeas petition, Dupuis contended that he never knowingly and intelligently waived his right to conflict-free counsel and that as a result of Fernald's representation of the city, Fernald's defense of Dupuis was compromised.

The Sixth Amendment right to counsel includes the right to conflict-free counsel. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  But "like the right to counsel of any kind, the right to conflict-free counsel can be waived."  *United States v. Greig*, 967 F.2d 1018, 1021 (5th Cir.1992).  To establish a valid waiver, the following requirements must be satisfied:

> (1) that the defendant be aware that a possible conflict of interest exists; (2) that the defendant realize the consequences to his defense that continuing with conflicted counsel would have; and (3) that the defendant be aware of his right to obtain other counsel.

*Crank v. Collins*, 19 F.3d 172, 176 (5th Cir.), *cert. denied*, 512 U.S. 1214 (1994) (citing *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975)).

Under these standards, the record evidence in this case demonstrates a valid waiver.  At the evidentiary hearing on Dupuis's PCR application, the state trial court heard extensive testimony on the issues of waiver and the effect of the conflict on Fernald's representation.  Fernald testified that when Dupuis first met with him, Fernald informed

him that he was the city attorney and asked him whether he had given any statements to the police.  Dupuis responded that he had not.  Fernald then spoke with the police officers, from whom he determined that they had not investigated the case and had in fact been told that they were not to be involved.  After speaking with the police officers, Fernald met again with Dupuis and explained that the police had not done an investigation and had only minimal involvement with the case.  Fernald gave Dupuis the option of having him withdraw, but Dupuis waived conflict.

Fernald testified that he discussed the conflict situation with Dupuis on at least two other occasions, including final meetings with Dupuis on the eve of each trial.  A transcript of the meeting before the first trial was admitted into evidence at the evidentiary hearing.  In the meeting, Fernald told Dupuis that the involvement of the police in his case was minimal and that their conduct was not at issue.  He stated once again that he was the City Attorney for Brookhaven but that he could also represent Dupuis, stating that  "the police are not really involved . . . to the best of my knowledge there is no conflict because the city police did not do anything other than arrest you and basically process the case."  Fernald went on to state that the testimony against Dupuis would come from the victim's mother, the victim, and the professionals who examined her.  He then asked Dupuis if he had any reservations as to any conflict of interest because Fernald represented the police, and Dupuis indicated that he did not.  Fernald testified that in addition to these discussions with Dupuis, the conflict issue was raised before the trial court at the omnibus

hearing, during which the judge questioned Dupuis about it.[4]

During the evidentiary hearing, the court heard similar testimony from the prosecutor, Diane Jones, and the trial judge, the Honorable Mike Smith.  According to Judge Smith, Fernald raised the conflict issue in open court with Dupuis present and went over it very thoroughly, explaining that he represented the city, including the police department, and that police officers would be testifying at the trial.  Fernald stated that if Dupuis wanted him to withdraw but could not afford to retain another attorney, the court would appoint an attorney for him.  Thereafter, Judge Smith questioned Dupuis himself in order to make certain that Dupuis wanted to waive the conflict.

Diane Jones, the prosecutor, echoed Judge Smith's testimony, recalling that Fernald raised the issue in court and indicated that he had already discussed the matter privately with Dupuis.  According to Jones, Fernald explained in the court proceeding that police officers were expected to testify and that if an issue arose as to an officer's truth or veracity, a conflict could arise.  Jones testified that Fernald informed Dupuis that just the mere fact that he represented both could raise a conflict and told Dupuis that he had the right to object to the conflict.  She also recalled that Dupuis's final words on the subject were that he wanted Fernald to represent him.

Dupuis's testimony varied greatly with that of Fernald, Ms. Jones, and Judge Smith.  He did not recall the conflict issue ever having been raised in open court.  He admitted that Fernald had told him that there could be a conflict, but said that Fernald told

---

[4]The parties were apparently unable to obtain a transcript of this hearing for the evidentiary hearing.

him "in the same breath" not to worry about the police officers' testimony.  On cross-examination, Dupuis was impeached with a statement from his sworn affidavit, attached as an exhibit to his PCR application, in which he stated that at no time had Fernald ever advised him of any conflict of interest.

At the end of the evidentiary hearing on Dupuis's PCR motion, the judge ruled from the bench that a conflict of interest had existed but that Dupuis had not been prejudiced by it.  He further found that Dupuis had knowingly, intelligently, and voluntarily waived the conflict.  Both rulings were affirmed.  This Court agrees Dupuis was aware of the conflict and consequences, and he understood his right to new counsel.  *Crank*, 19 F.3d at 176.

But even if this Court were to find no waiver and further find cause and prejudice allowing Dupuis to overcome his default, that would merely entitle him to review of the state court's waiver ruling under the highly deferential standard of review set forth in 28 U.S.C. § 2254(d).  Habeas relief under that section arises only if the state court's rejection of a claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *Id.*

Here, the factual findings underlying the state court's finding of a valid waiver, *i.e.,* that Fernald and the trial judge informed Dupuis of the nature of the conflict and the implications of waiver, that Dupuis understood these, and that he nevertheless insisted that Fernald represent him, were clearly reasonable in light of the testimony at the hearing.

Furthermore, the state court's application of Supreme Court law to those findings was not objectively unreasonable.  Accordingly, if the default were forgiven, the Court would still defer to the state court's holding that Dupuis entered into a valid waiver of his right to conflict-free counsel.

> 2.      Whether Counsel's Conflict Affected Representation

"[T]he finding of a waiver obviates a determination of whether there was an actual conflict."  *United States v. Plewniak*, 947 F.2d 1284, 1287 n. 1 (5th Cir. 1991), *cert. denied*, 502 U.S. 1120 (1992) (citation omitted).  Nevertheless, review of that claim demonstrates its futility.

Habeas claims alleging denial of the Sixth Amendment right to effective counsel are normally analyzed under the familiar test found in *Strickland v. Washington*, 466 U.S. 668 (1984).  But a petitioner who alleges a Sixth Amendment violation based on his attorney's alleged conflict of interest because of multiple representation, and who did not object to the conflict at trial, "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  If he establishes that his attorney's representation of conflicting interests adversely affected the quality of representation, he is entitled to relief without inquiry as to whether the conflict affected the outcome of the trial; in other words, he is relieved of the requirement of showing *Strickland* prejudice.  *Id.*, 446 U.S. at 349–50; *Mickens v. Taylor*, 535 U.S. 162 (2002).

The question before the state court in this regard was whether Fernald's performance was compromised by his simultaneous representation of the City of

13

Brookhaven, and it answered this question in the negative.  An analysis of these issues, particularly the importance *vel non* of the police officers' testimony, requires an understanding of the context of that testimony.

The prosecution's first witness was Susan Smith.  She testified concerning the phone call from her daughter, the condition in which she found her daughter at the Dupuis home, and the events at the hospital.  At the emergency room, Susan Smith and her husband were met by and spoke with Officers Chris Case and Larry Warren of the Brookhaven Police Department.  Later that morning, Susan and Bob went to the police station and talked with Officer Noland Jones about filing charges.

The testimony of Officers Case and Warren was as follows.  At the hospital, Case spoke  with Jenny briefly.  He described her as very upset, and he tried to help her calm down.   Susan relayed to the officers what Jenny had told her— that Jenny was sleeping on the sofa when she was awakened by Dupuis, who began rubbing her leg and putting his hand into her panties, and that she pretended to still be asleep because she was scared.  Bob Smith then left the hospital to go out to May Fabrication (Mayfab), where Smith and Dupuis worked.  Case and Warren followed him because Susan Smith expressed concern that her husband might start a fight with Dupuis.  When Case and Warren arrived at Mayfab, they found Bob Smith talking with his boss.  The officers asked Dupuis to leave, and he complied with their request.  Case and Warren left shortly thereafter and spoke with Nolan Jones, the assistant police chief, about the case.  Jones told them that he wanted to talk with Dupuis, so Case and Warren went over to the Dupuis residence, where they found a rusty Camaro which they had been told Dupuis had been

14

driving that morning.  Warren and Case checked the hood of the vehicle—which was

warm.  Warren also noticed cigarettes lying on the car seat and testified that this led him

to believe Dupuis was at the house because a smoker would not leave his cigarettes.

Dupuis's teenage son, Tyler, answered the door and refused to let the officers enter the

house.  He told them Dupuis was gone, a fact Case and Warren later confirmed.  That

evening, Officer Case prepared a written report.

The third officer testifying for the prosecution was Officer Nolan Jones, the

assistant police chief.  When the Smiths arrived at the police station on the morning of the

incident, Jones told Smith how to file charges against Dupuis.  Jones had further

involvement two days later after Dupuis was arrested in McComb, Mississippi, by

McComb police officers.  When Dupuis arrived at the Brookhaven police station, Jones

advised Dupuis of his Miranda rights and informed him of the charges.  On cross-

examination by defense counsel, Jones testified that when he explained the charges to

Dupuis, Dupuis responded by asking "What can I get for this?"  Jones testified that he

thought this was a strange question.  On redirect, the prosecutor asked him how many

innocent people had ever asked him this question; he replied that he did not recall an

innocent person ever asking such a question.

The only other subject addressed in Jones's testimony concerned Nancy Dupuis

and her relationship with Susan Smith.  Jones stated that on the morning of the incident,

Nancy Dupuis came with Susan to the police the station.  Susan was very upset, but

apparently did not direct any of her anger at Nancy; rather, according to Jones, the two

appeared to be very good friends.  When Nancy came to the station after her husband's

arrest to pick up the keys to his vehicle, Susan came with her, and Nancy appeared to be upset with Dupuis.  Jones testified that since that time, however, Nancy has been supportive of her husband.  Jones explained that he performed no other investigation of the allegations, was not involved with the interview of Jenny at the Child Advocacy Center, and had no other involvement in the case.

Bente Hesse, a counselor at the CAC, provided important testimony for the state. Ms. Hess explained that the sole job of the CAC is to interview a child once a referral because of suspected child abuse is made from law enforcement, the district attorney's office, or DHS.  The CAC plays no other part in investigation of the allegations.  Hess described her training in interview techniques and testified that the goal of an interview is to elicit the truth and determine whether the child's allegations are credible.  She described the interview situation and manner of the interview, explaining that they are designed to put the child at ease, to elicit a narrative from the child in a non-leading manner, and to look for signs of deception or coaching.  Hess testified that in the present case, the referral was made by DHS following Amanda Russell's interview with Jenny at the hospital.   Hess described Jenny's statement as clear, logical and detailed.  She stated that Jenny gave no inappropriate responses and that there were no signs that Jenny had been coached or that her statements were false or embellished.  Based upon these factors, Hess concluded that Jenny's statement was credible.  Hess's  interview with Jenny lasted approximately fifteen minutes and was recorded on video tape, a copy of which was played for the jury.

The most damaging evidence at trial came from the victim.  Jenny testified that on

Easter Sunday, Tim and Nancy Dupuis and their young son, Noah, visited the Smith home.  Jenny, Jessica, and Noah played with dolls while the adults played cards.  When the Dupuises left, Jenny and Jessica left with them as previously arranged, because the children were out of school the next day and Susan Smith had an early morning doctor's appointment.  At the Dupuis home, Petitioner and his wife slept in their room, their older son, Tyler, slept in another room, and Jenny, Jessica, and Noah slept in the living room; Jenny slept on a small sofa.  Jenny awakened the next morning to find Dupuis sitting on her feet on the couch.  Dupuis was telling her that she was pretty and beautiful and "stuff like that," while rubbing her arms, legs and back.  Jenny kept her eyes shut.  Dupuis then moved up on the couch, put his hands in her panties, and penetrated her vagina with one or more fingers.  Jenny testified that this was painful and that she wiggled to try to get him to stop.  Eventually he did so, got up from the couch, and walked outside.

After Jenny heard the door close, she went to the window, through which she saw Dupuis standing beside his car with his hands in front of him.  Once Dupuis left, Jenny tried to awaken Dupuis's wife but was unable to do so.  She then called her mother. When Susan Smith came to the phone, Jenny, apparently too upset to talk, could only say "Uncle Tim."  Her mother then asked, "Did he mess with you?"  Jenny responded,  "Yes, ma'am" and started crying.  Susan rushed to the Dupuis home and took Jenny to the hospital.   At the end of her direct testimony, Jenny stated that prior to the assault, she liked Dupuis and considered him family.  She testified that now she does not like him.

Two witnesses, Dupuis and his son Tyler, testified for the defense.  Dupuis denied the allegations and testified that on the morning in question, he got out of bed around 5:15

17

a.m., went directly to the bathroom, came out of the bathroom a few minutes later, and walked directly to the door and out of the house for work.  After learning of the allegations later that morning, he became very distraught and drove in his Bronco for approximately six hours to his mother's home in Texas.  From there, he went to the home of friends in Bogue Chitto, Mississippi.  When he found out about the arrest warrant, he left, took an overdose of over-the-counter sleeping pills, and drove to the parking lot of the Southwest Mississippi Regional Medical Center in McComb, where he was arrested on April 18, 2001.

Tyler Dupuis testified that he heard his father get up around 5:15 a.m., go into the bathroom for a few minutes, and walk straight from the bathroom out the door to his car. Dupuis then started his car and drove away to work.

In an attempt to show that Fernald had compromised his defense of Dupuis, Dupuis's counsel at the hearing posed questions concerning Fernald's failure to object to the admission of Officer Case's police report, his failure to object during direct examination of the police officers, his cross-examination of the police officers, and a comment he made during closing argument.  Fernald defended all of these decisions as sound trial strategy.

First, regarding his failure to object to the police report, Fernald stated that there was nothing in the report other than Susan Smith's account of the events—matters that would come out anyway in her testimony.  He explained that one of his trial themes was that the police conducted no independent investigation.  Fernald believed the brevity of the police report demonstrated the lack of investigation.

Second, Fernald defended his decision to refrain from objecting during the officers' testimony and from aggressively cross-examining them by explaining that their testimony was not damaging to his client and that attacking the officers in front of the jury could have been counterproductive.

Third, Dupuis suggested that cross-examining the officers about the warmth of the hood and the presence of cigarettes in the car led the jury to believe Dupuis was attempting to evade the police. When questioned about this at the evidentiary hearing, Fernald again referenced his theme that the police officers conducted a minimal investigation.

Fourth, Fernald explained why he examined Officer Jones concerning Dupuis's question about the amount of time he could get for the charge. According to Fernald, he raised the issue in an attempt to show that Dupuis was not a habitual sex offender and was unfamiliar with the criminal process. Although there was no direct evidence of prior conduct, there was suggestion in the record that this was not Dupuis's first issue. For example, when the minor called her mom, the mother immediately asked whether Dupuis had "messed with" her.

Finally, Fernald responded to the suggestion that his closing argument bolstered the officers' testimony by remarking that the police had done their job. The statement came in Fernald's summary of the events following Jenny's call to her mother and related to the defense that neither the police nor DHS ever performed an investigation of the allegations. Fernald argued that the police were not allowed to investigate and were "cut out of the loop" once the arrest warrant was issued. He then described what happened

19

after Ms. Hess interviewed Jenny and prepared her report:

> Now, this story takes on a life of its own.  Then she uses the word substantiate.
> With what?  All it means is there was a complaint, it's concern, we need to
> investigate.  She said that yesterday.  And we all know what kind of investigation
> followed.  None, no further investigation of any kind, a one-page statement, never
> corroborated, put in a file.

> Finally, the police, Chris Case and Captain Warren did their job.  They went out
> there, they went to the business.  They prevented an altercation that apparently
> prevented him from resigning apparently, that's one thing they did do, one positive
> that happened in this case.  At that time, everybody is still in a state of flux.  They
> go out there to the house.  He's not there; he's not there.  No warrant has been
> issued.  Nothing has been done at that point in time.  They let him go and told him
> to.  He did what they told him to do, he got out of there.

Tr. 313-14.

In his testimony at the evidentiary hearing, Fernald defended his statements by

saying that his intent was to convey to the jury the fact that police involvement did not

necessarily indicate that a crime had been committed.  In other words, he wanted to point

out that Officers Case and Warren went to Dupuis's place of employment not to arrest

Dupuis or investigate a crime, but simply to prevent an altercation between Dupuis and

Bob Smith.

In light of this record, the Court finds that Dupuis never established that the conflict

"adversely affected his lawyer's performance."  *Cuyler*, 446 U.S. at 348.  Fernald

vigorously defended Dupuis through two trials.  His testimony repeatedly emphasized that

the evidence against Dupuis came not from the police officers, but from the professionals

who treated and interviewed Jenny, Jenny's mother, and Jenny herself, and the trial

record bears this out.  As for the officers, Fernald clearly attacked the adequacy of the

investigation, noting that there was no investigation at all.  Dupuis has not shown that the

20

conflict affected the representation.[5]

The Mississippi Court of Appeals did not address *Cuyler*—there was no need to do so in light of its waiver finding.  It did, however, review the merits of the *Strickland* argument finding no violation.  This Court agrees.  Trial counsel's strategic decisions were at least reasonable, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690-91.  Moreover, there is no showing that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

Finally, the Mississippi Court of Appeals found no merit to the *Strickland* claim, and such decisions receive substantial deference under § 2254.  *See Premo v. Moore*, 131 S. Ct. 733 (2011) (explaining that § 2254(d) deference compounds when applied to other deferential tests such as the *Strickland* test).  Thus, if the default is overcome, the petition would still be denied because the state court's rejection of Dupuis's *Strickland* claim was correct and did not result from an unreasonable application of Supreme Court law or an unreasonable determination of facts.  *Id.*

III.    Conclusion

Dupuis's ineffective assistance claims based upon his attorney's failure to object to the state's closing argument and his attorney's performance at sentencing and on appeal are procedurally barred because they were never raised in state court and there is now no available procedure for presenting them to the state courts.  The remaining claims are

---

[5]In fact, Fernald achieved a hung jury on the first trial and Dupuis was convicted of a lesser offense at the second trial thereby avoiding a life sentence.

procedurally barred because even though Dupuis raised them in state court, he failed to properly exhaust by seeking discretionary review, and his time for doing so has expired. Dupuis's attempt to establish cause for his default of these latter claims ultimately avails him nothing.  A separate judgment in accordance with Federal Rule of Civil Procedure 58 will be entered.

      **SO ORDERED AND ADJUDGED** this the 30th day of September, 2011.

                                 s/ *Daniel P. Jordan III*
                                 UNITED STATES DISTRICT JUDGE